A04A1622. FRAKER v. C. W. MATTHEWS CONTRACTING
COMPANY, INC. et al.
A04A1623. GAUMER v. C. W. MATTHEWS CONTRACTING
COMPANY, INC. et al.

(614 SE2d 94)

PHIPPS, Judge.

On December 23, 1995, a vehicle driven by Jerry Fraker was involved in a multiple-vehicle collision on the ramp merging from Georgia 400 South onto Interstate 285 East. Fraker thereafter exited his car and was struck by a vehicle. The ramp was within an ongoing construction project. In 1993, the Georgia Department of Transportation (the DOT) entered into a contract with C. W. Matthews Contracting Company, Inc. and Shepherd Construction Company, Inc., operating as a joint venture, for 5.087 miles of road widening on I-285.[1] Fraker filed a negligence action against the DOT, C. W. Matthews, and Shepherd, claiming that he had sustained injuries in the accident.

The DOT and the contractors filed motions to add as a defendant Paula Malone, the driver of one of the vehicles involved in the collision.[2] The contractors also filed motions for summary judgment against Fraker, arguing that their work had been performed pursuant to the DOT's specifications and in a nonnegligent manner.[3] In addition, the contractors filed third-party complaints against Bettina Gaumer, the driver of another vehicle involved in the collision. Gaumer counterclaimed against the contractors and cross-claimed against the DOT, alleging she had sustained injuries due to their negligence at or around the ramp.

The trial court granted the contractors' motions for summary judgment. Regarding the motions to add Malone as a defendant, the trial court ruled that OCGA § 51-12-33 (a)

grants to Defendants, if the finder of fact concludes Plaintiff is himself to some degree responsible for the injury or

---

[1] C. W. Matthews performed the construction on the eastbound lanes of I-285; Shepherd performed the construction on the westbound lanes of I-285.

[2] Alternatively, these defendants sought to dismiss Fraker's action. They asserted that this case was a renewal action, pursuant to OCGA § 9-2-61, of a prior case that had included Malone as a defendant; that without Malone in this action, they were deprived of their right to have their liability apportioned against that of Malone; that Malone's absence from this action contravened the requirement of OCGA § 9-2-61 (a) that a renewal action must be based upon substantially the same cause of action; that Fraker therefore had failed to file a valid renewal action; and that the time to do so had since expired.

[3] See *Abercrombie v. Ledbetter-Johnson Co.*, 116 Ga. App. 376 (157 SE2d 493) (1967) (where contractor follows employer's specifications and injury results, contractor is not liable, unless contractor performed work in negligent manner); *C. W. Matthews Contracting Co. v. Marasco*, 184 Ga. App. 150 (361 SE2d 34) (1987) (physical precedent only).

damages he claims, the right to seek from the jury apportionment of its award among all those persons who were liable to Plaintiff and whose degree of fault was greater than Plaintiff's, including Paula Malone, though she is not a named Defendant in this action.

Fraker and Gaumer appeal these rulings in Case Nos. A04A1622 and A04A1623, respectively. We affirm the trial court's ruling on the contractors' motions for summary judgment and reverse the trial court's ruling concerning apportioning damages against Malone.[4]

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[5] We review a trial court's grant of summary judgment de novo, viewing the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[6]

Construed in this light, the record shows that by late November 1995, the ramp and its merge area had been the site of numerous accidents. Buddy Jump, a vice president of C. W. Matthews, recalled receiving a telephone call from Gary King, the DOT's construction engineer, about modifying the acceleration lane for the ramp. Jump deposed that he was concerned about whether "we could fit the ramp in . . . but apparently the DOT had already verified that." Jump recalled that King told him that the DOT had already done "some level of rough precursory work" concerning the ramp.

On December 15, representatives from the DOT and C. W. Matthews met at the ramp. Jump testified, "we met on-site and tried to do a rough layout, possible layout, at the direction of what the DOT wanted as far as lengthening the acceleration lane." Jump stated, "[W]e did put in a rough layout with some paint marks to delineate where the possible new — not new, but the extension of the acceleration lane from 400 could possibly go to accommodate what Mr. King had apparently conveyed to the DOT project people and myself." Later in the deposition, Jump recapped,

> I do not recall ever receiving any drawing. The [DOT] representatives had in mind apparently what room was available and what was to be accomplished by the lengthening of the acceleration lane. So we basically just painted a few dots where the possible lane lines would be with the

---

[4] Pretermitting whether Gaumer has standing to challenge these rulings, because she makes some, but not all, of Fraker's arguments, her contentions are disposed of by our holdings in Case No. A04A1622.

[5] OCGA § 9-11-56 (c).

[6] *Hubbard v. Dept. of Transp.*, 256 Ga. App. 342, 343 (568 SE2d 559) (2002).

extension. And at this meeting I think we just verified, in fact, on-site that there was enough room in length to extend the acceleration lane.

Jump testified that C. W. Matthews reassigned its crews "to accommodate the lengthening of the acceleration lane pursuant to what the DOT wanted us to do."

On December 20, C. W. Matthews changed the ramp into its configuration as of December 23. On that date, Gaumer drove down the ramp shortly after midnight. She recalled that she saw a 25 mph sign and then slowly "came around and I proceeded to go straight, I felt as if I was in a tunnel." Gaumer testified that she did not recall seeing any street lights and that the ramp was very dark. She recalled that there was a cement barrier wall to her left and construction barrels to her right; that "all of [a] sudden the lane that [she] was in was completely gone"; and that she suddenly realized that she was at the edge of I-285. At the point she should have merged onto I-285, Gaumer slammed on her brakes. Fraker was driving behind Gaumer and also found the area to be very dark. Fraker was able to stop his car without running into Gaumer's car. The next car, driven by Julie Donaldson, rear-ended Fraker's car, knocking it into Gaumer's car. Fraker, Gaumer, and Donaldson exited their cars. Another car came along and, while slowing to merge onto I-285, that car was hit by the following car, which was driven by Malone. Fraker, Gaumer, and Donaldson were then personally hit by Malone's car.

According to Herman Hill, Fraker's consultant on traffic engineering and accident reconstruction, the newly configured merge-taper area of the ramp was not long enough to allow motorists to safely negotiate into I-285 traffic. He deposed that lengthening the acceleration lane, while leaving an insufficient merge-taper area, made the ramp even more dangerous because that design enticed motorists to accelerate into a short merge-taper area. In addition, Hill stated that the concrete barrier wall should not have been placed between traffic lanes traveling in the same direction because it interfered with the drivers' ability to anticipate merging traffic — particularly at night because the barricade made it difficult to see the headlights of oncoming traffic. Further, Hill deposed that the concrete barrier wall and the short merge-taper area warranted street lighting to give motorists clear vision of the entire area.

## Case No. A04A1622

1. Fraker correctly argues that the trial court erred in ruling the jury could apportion damages against Malone.[7]

It was Malone's car that hit Fraker's person, and the contractors and the DOT sought to add Malone as a defendant to allow for damages to be apportioned against her. The trial court ruled that, pursuant to OCGA § 51-12-33 (a), the jury could apportion damages against Malone without her being a party. However, we have consistently held that OCGA § 51-12-33 (a) does not authorize a jury to apportion damages against a nonparty.[8] Accordingly, the trial court's ruling is reversed.

2. Fraker claims that the contractors should be held liable for the negligent design of the ramp, arguing that the trial court erred in concluding that the DOT, not the contractors, was responsible for the design of the ramp. We find no merit in this claim.

Georgia law dictates that the DOT shall have control and responsibility for all construction and maintenance of the state highway system.[9] OCGA § 32-2-2 (a) (1) pertinently provides,

> (1) The [DOT] shall plan, designate, improve, manage, control, construct, and maintain a state highway system and shall have control of and responsibility for all construction, maintenance, or any other work upon the state highway system and all other work which may be designated to be done by the department by this title or any other law.

Dennis Womack, the DOT's project engineer on the I-285 construction project at the time of the incident, affirmed in a deposition that the project was designed by the DOT. Likewise, Jump deposed that C. W. Matthews configured the ramp pursuant to the DOT's design.

---

[7] OCGA § 51-12-33 (a) provides in pertinent part,
Where an action is brought against more than one person for injury to person or property and the plaintiff is himself to some degree responsible for the injury or damages claimed, the trier of fact, in its determination of the total amount of damages to be awarded, if any, may apportion its award of damages among the persons who are liable and whose degree of fault is greater than that of the injured party according to the degree of fault of each person.
[8] See *Schriever v. Maddox*, 259 Ga. App. 558, 561-562 (2) (c) (578 SE2d 210) (2003); *Dept. of Transp. v. Blair*, 220 Ga. App. 342, 345 (2) (469 SE2d 446) (1996).
[9] *Hubbard*, supra at 346 (2) (b).

However, Fraker claims that there is evidence that the DOT "relinquished control of the design and reconfiguration to C. W. Matthews" and that "C. W. Matthews voluntarily undertook the task of designing the ramp."

First, Fraker cites evidence that he claims shows that the DOT presented "no plans, no drawings, no diagrams — no sealed engineering specifications" to C. W. Matthews regarding the modification of the ramp. OCGA § 32-2-2 (a) (3) provides that,

> The [DOT] shall provide for surveys, plans, maps, specifications, and other things necessary in designating, supervising, locating, abandoning, relocating, improving, constructing, or maintaining the state highway system or any part thereof, or any activities incident thereto, or in doing such other work on public roads as the department may be given responsibility for or control of by law.

But the fact that the DOT provided no formal document to C. W. Matthews does not imply that the contractor constructed something other than what the DOT otherwise directed. According to Jump, the DOT provided to the contractor what was necessary to communicate to it the changes to be made to the ramp. DOT representatives met with C. W. Matthews employees at the ramp, where they delineated the DOT's changes. This evidence shows that, upon receiving the DOT's instructions, the contractor implemented the DOT's design. Furthermore, evidence that a contractor made suggestions to the DOT regarding certain practical aspects of the project design to ensure the construction complies with the DOT contract does not show that the DOT therefore relinquished control of the design of the project to the contractor.[10]

Next, Fraker cites the testimony of DOT employee Sam Wheeler, whose assignment on the project was to inspect bridge construction. Wheeler attended the December 15 meeting at the ramp in Womack's absence only to gather information and report it to Womack. Wheeler deposed that he understood from that meeting that C. W. Matthews would be changing the ramp to its final configuration according to the DOT's plans — not to an intermediate one like the one in place at the time of the accidents. Contrary to Fraker's claim, this testimony does not establish that the DOT relinquished control of the design to C. W. Matthews; according to this testimony, the DOT still controlled the ramp's design.

---

[10] See id. at 347 (evidence that contractor made suggestions to the DOT did not show that the DOT relinquished control of design to contractor).

Fraker also cites a DOT response to one of his requests for admissions. Fraker asked the DOT to admit that it "participated in the reconfiguration of the subject ramp that took place on or about December 20-21, 1995." The DOT responded, "Denied. The reconfiguration of the subject ramp was performed by the contractors." But even construed in the light most favorable to Fraker, this response shows that the contractors performed the work; it does not show that the contractors *designed* the new configuration.

Finally, Fraker argues that under *Gilbert Corp. of Delaware v. Yetman*,[11] the contractors may be held liable for the allegedly negligent design of the ramp. In that case, contractors doing roadwork under contract with the DOT were held liable for a motorist's death caused by inadequate erosion control at the worksite.[12] However, the contract between the contractors and the DOT in that case specified that erosion control was the contractors' responsibility and a DOT witness testified that the contractors were expected to exercise their judgment regarding implementation of erosion control measures.[13] Fraker makes no claim that the contract at issue here specified that the design of the ramp was the contractors' responsibility, pursuant to which the contractors exercised their judgment. *Gilbert Corp.*, therefore, is distinguishable.

3. Fraker contends that the contractors should be held liable for negligently controlling traffic. In granting the contractors summary judgment on Fraker's claim of negligent traffic control, the trial court relied on *Hubbard v. Dept. of Transp.*[14] and *C. W. Matthews Contracting Co. v. Marasco*.[15] In *Hubbard*, a plaintiff filed a negligence action against C. W. Matthews, Shepherd, the DOT, and several individual drivers to recover damages for injuries sustained in a November 26, 1995 accident on the same ramp at issue in the instant case, albeit prior to the changes implemented December 20. Notably, the construction project involved in the instant case was ongoing at the time of the *Hubbard* accident. And *Hubbard* considered the same contract between the DOT and C. W. Matthews and Shepherd at issue here. This court concluded in *Hubbard* that the contractors could not be held liable for the plaintiff's injuries because it was the DOT's responsibility to designate the location for, and the manner of placement of, the traffic control devices and to approve all traffic control plans and because the contractor erected or implemented the traffic

---

[11] 219 Ga. App. 320 (464 SE2d 822) (1995).
[12] Id. at 321.
[13] Id. at 321-322 (2).
[14] Supra.
[15] Supra.

control devices pursuant to the DOT's directives.[16] In reaching that conclusion, this court cited *Marasco*, holding that because the contractor "neither designed nor determined the location for or the manner of placement of" a road sign struck by the plaintiff's vehicle, "but instead complied with explicit directions, specifications and orders of the [DOT] with respect to erection of the sign alongside the roadway," the contractor could not be held liable for the plaintiff's injuries.[17]

OCGA § 32-6-50 (a) pertinently provides that "[t]he [DOT] shall promulgate uniform regulations governing the erection and maintenance on the public roads of Georgia of signs, signals, markings, or other traffic-control devices, such uniform regulations to supplement and be consistent with the laws of this state." Subsection (b) of the statute continues, "In conformity with its uniform regulations, the [DOT] shall place and maintain, or cause to be placed and maintained, such traffic-control devices upon the public roads of the state highway system as it shall deem necessary to regulate, warn, or guide traffic. . . ."

Furthermore, the contract between the contractors and the DOT provided specific guidelines for traffic control during the project and required the approval of Womack of any traffic control plans. Section 150.01 (E) of the contract states that "[t]he Contractor shall secure the Engineer's approval of the Contractor's proposed plan of operation, sequence of work and methods for providing for the safe passage of traffic before it is placed in operation." Regarding signs, Section 150.03 (D) provides, "Temporary guide, warning, or regulatory signs required to direct traffic shall be furnished, installed, reused and maintained by the Contractor in accordance with the MUTCD, the Plans, Special Provisions, *or as directed by the Engineer*."[18] Further, that section prohibits the contractors from removing existing signs without the Engineer's approval. Regarding pavement markings, Section 150.04 (A) provides, "If the pavement markings are, or become, unsatisfactory in the judgement of the Engineer due to wear, weathering, or construction activities, they shall be restored immediately. . . . On widening, reconstruction, and new construction projects, pavement markings will be as required by the Plans or the Engineer." And in Section 150.01 (G), the DOT reserves the right to restrict construction when, in the opinion of the Engineer, the work would seriously hinder traffic flow on days involving unusual traffic

---

[16] *Hubbard*, supra at 348-349.

[17] *Marasco*, supra.

[18] (Emphasis supplied.)

conditions. Finally, Section 150.08 provides, "Failure of the Contractor to comply with this Specification shall be reason for the Engineer suspending all other work on the Project, except erosion control and traffic control," taking certain corrective actions and withholding payment of monies due the contractors.

Notwithstanding these statutory and contractual provisions and the similarities of this case to *Hubbard* and *Marasco*, Fraker argues that an issue of fact regarding traffic control is created by two DOT responses to his request for admissions. In one request, Fraker asked the DOT to admit that it "did not prepare any traffic control plans for the reconfiguration of the subject ramp," to which the DOT responded, "Admitted, because traffic control was the responsibility of the contractors." In the other request, Fraker asked the DOT to admit that it "did not provide any traffic control plans for the reconfiguration of the subject ramp to C. W. Matthews," to which the DOT responded, "Admitted, because the traffic control was the responsibility of the contractors."

These responses, however, present no issue of fact. Evidence that the DOT neither "prepared" nor "provided" traffic plans to the contractors does not show that the traffic plans implemented by the contractors were not pursuant to the DOT's direction. Although the contract between the contractors and the DOT allowed for the "contractor's *proposed plan* of operation, sequence of work and methods of providing for the safe passage of traffic,"[19] it plainly stated that no traffic plan could be implemented until Womack's approval was secured. Likewise, evidence that the contractors were responsible for controlling traffic during the construction project does not show that the contractors implemented traffic control measures that were not pursuant to the DOT's direction. Womack confirmed in his deposition that reconfiguring the ramp required planning for traffic control and that he was responsible for ensuring contract compliance. In addition, Jump deposed, "We could not turn the traffic on the lengthening of the acceleration lane until the [DOT] was satisfied with the work items completed," specifically citing traffic control. Fraker has failed to cite evidence creating an issue of material fact regarding whether the contractors controlled traffic pursuant to something other than DOT's instructions.

Alternatively, Fraker argues that there are issues of material fact regarding whether C. W. Matthews negligently failed to comply with the DOT's instructions on controlling traffic. Specifically, he claims that C. W. Matthews failed to post "short merge ahead" on a variable message sign ("VMS") at the beginning of the ramp. But

---

[19] (Emphasis supplied.)

Womack explained that a VMS was to be used to indicate lane closures while the ramp was being changed. Similarly, a DOT admission stated that (1) no VMS warning motorists of a short merge or short taper was present at the time of the incident because the "ramp and merge had been lengthened" and no such sign was necessary; and (2) a VMS at the ramp then displayed "25 mph" instead. Fraker next claims that C. W. Matthews failed to post a speed limit of 45 mph on I-285 along the entire length of the project, but he provides no record citation supporting that claim. Fraker also claims that C. W. Matthews failed to illuminate the area, but he does not show that the DOT instructed the contractor to do so. Womack deposed that the only illumination required was when there was work being done at night so that the workers could be seen. He stated that the DOT did not require illumination to make the construction area brighter in general. Fraker claims that C. W. Matthews failed to designate traveling lanes with clear pavement markings. But according to Womack, the pavement was marked as the DOT had requested. Finally, Fraker claims that the cement barrier wall should not have been where it was placed, but Jump deposed that, if the DOT had not been satisfied with that wall, then the ramp would not have been opened for traffic. Fraker has failed to cite evidence that C. W. Matthews failed to comply with the DOT's instructions.

The record shows that the DOT was required to place and maintain, or cause to be placed and maintained, traffic control devices and that the DOT was responsible for approving all traffic control plans before implementation by a contractor. Fraker has not shown that C. W. Matthews failed to implement the traffic control devices pursuant to the DOT's directives. Although Fraker's accident reconstructionist and drivers involved in the accident found the traffic control measures inadequate or improper, Fraker has failed to show that the contractors can be held liable and thus has failed to show that the trial court's grant of summary judgment to the contractors on the negligent traffic control issue was error.[20]

4. Fraker contends that the trial court erred in sua sponte granting summary judgments on what he claims were separate counts: negligent inspection of the roadway, negligent maintenance of the roadway, and negligent work performance by the worksite traffic control supervisor. Fraker asserts that had the contractors not been negligent in these regards, they would have discovered and corrected the alleged problems with the signage, pavement markings, lighting, and the concrete barrier wall.

---

[20] See *Hubbard*, supra at 347-349 (2) (c); *Marasco*, supra at 152.

Although our law concerning motions for summary judgment allows a trial court to grant, sua sponte, a summary judgment, a trial court's authority to do so is not unlimited. The grant of summary judgment must be proper in all other respects. This means that in addition to ensuring the record supports such a judgment, the trial court must ensure that the party against whom summary judgment is rendered is given full and fair notice and opportunity to respond prior to entry of summary judgment.[21]

The record shows that Fraker was presented a full and final opportunity to meet and attempt to controvert the contentions made against him in the contractors' motions for summary judgment.[22] The fact that the contractors did not formally move for summary judgment on each of those allegations is not dispositive.[23] The basis of their motions was clear: they could not be held liable for his injuries because they had performed the work pursuant to the DOT's specifications in a nonnegligent manner. Moreover, in opposing the contractors' motions, Fraker raised his claims of negligent roadway inspection, negligent roadway maintenance, and negligent supervision of traffic control.

Furthermore, as we determined in Division 3, Fraker has failed to point to specific evidence giving rise to a triable issue on the issue of traffic control. Consequently, he has demonstrated no error in the trial court's ruling granting the contractors' motions for summary judgment.

### Case No. A04A1623

5. Because of our holding in Division 1, we need not reach Gaumer's challenge to the trial court's ruling concerning apportionment of damages against Malone as a nonparty.

6. Gaumer contends that the trial court erred in granting the contractors summary judgment on the issue of negligent traffic control, asserting some, but not all, of the arguments made by Fraker. Our holding in Division 3 renders this contention moot.

*Judgments affirmed in part and reversed in part. Johnson, P. J., and Smith, P. J., concur.*

---

[21] (Citations and punctuation omitted.) *Hodge v. SADA Enterprises*, 217 Ga. App. 688, 690 (1) (458 SE2d 876) (1995).

[22] See *Plantation Pipeline Co. v. Royal Indem. Co.*, 245 Ga. App. 23, 30 (4) (537 SE2d 165) (2000).

[23] See id.

DECIDED MARCH 30, 2005 —
RECONSIDERATION DENIED APRIL 14, 2005 — 

*Bovis, Kyle & Burch, Steven J. Kyle, John H. Peavy, Jr., William J. Orr*, for Fraker.

*Moore, Ingram, Johnson & Steele, William R. Johnson, Alexander T. Galloway III, John L. Skelton, Jr., Roy E. Barnes, John H. Ross, Shivers & Associates, Larry G. Cobb*, for C. W. Matthews Contracting Company, Inc. et al.

*Harper, Waldon & Craig, John B. Craig, Anne W. Garliss, Matt Shade*, for Gaumer.

*Smith, Currie & Hancock, Robert C. Chambers*, amicus curiae.