### A07A1069. IN RE CARTER.
(653 SE2d 860)

MIKELL, Judge.

This appeal arises from the grant of dispositive relief to all defendants[1] in an action originally brought by Vicki Troutman, the mother of Raveen Carter, a child who endured a debilitating stroke at the age of 12. Carter suffers from sickle cell anemia. Unfortunately, although Carter's disease was diagnosed shortly after she was born at Georgia Baptist Hospital (the "Hospital"), she and Troutman slipped through the cracks of a system designed by the Division of Public Health of the Georgia Department of Human Resources (the "DHR") to comply with a statute requiring notification of parents of

---

[1] The Georgia Department of Human Resources; Dr. W. David Hammad and his medical practice, Hammad, Platner, and Charles-May, M.D., P.C.; Dr. Nora Patonay and her medical practice, Conyers Pediatrics, P.C.; the Sickle Cell Foundation of Georgia, Inc. (the "Foundation"); and The Board of Regents of the University System of Georgia on behalf of Medical College of Georgia ("MCG"). Conyers Pediatrics, P.C., was dismissed from the action by consent order.

children afflicted with sickle cell anemia and sickle cell trait.[2] Troutman did not receive official notice of her child's illness, and it was never treated. Troutman sued the DHR, the entities with whom the DHR had contracted to provide notice and counseling services, and the pediatricians who allegedly were assigned to attend to Carter in the hospital at her birth, alleging negligence and negligence per se based on their violation of the notification statute. The trial court ruled that no private right of action exists for violation of OCGA § 31-12-7 and that any cause of action against the defendants based on the statute failed as a matter of law. We affirm, but for a different reason. Pretermitting whether a private right of action exists for a violation of OCGA § 31-12-7, we do not believe that the General Assembly intended to impose strict liability for violating the notice requirement, either upon the DHR, its contractors, or any medical provider. Although achieving actual notice to a parent of each and every afflicted child is the goal of the system, the evidence shows that it is not attainable. With regard to the DHR, substantial compliance is all the law requires,[3] and in the case at bar, the evidence shows that the DHR, through MCG's arrangement with the Foundation, made every reasonable effort to contact the mother. For this reason, the DHR, MCG, and the Foundation were properly dismissed or granted summary judgment. In addition, MCG and the physician defendants were properly dismissed or granted summary judgment based on Plaintiff's[4] failure to file an expert affidavit pursuant to OCGA § 9-11-9.1.

## BACKGROUND AND PROCEDURAL POSTURE

Carter was born on February 9, 1991, and underwent screening for sickle cell anemia and sickle cell trait pursuant to the Georgia Newborn Screening Program ("GNSP") established by the DHR in compliance with OCGA §§ 31-12-6 and 31-12-7.[5] Under OCGA § 31-12-6 (a), the DHR

shall promulgate rules and regulations creating a system for the prevention of serious illness, severe physical or developmental disability, and death caused by genetic conditions. . . . The system shall have five components: screening newborns for the disorders; retrieving potentially affected screenees back into the health care system; accomplishing

---

[2] OCGA § 31-12-7 (b).

[3] See OCGA § 1-3-1 (c).

[4] Plaintiff is Ann J. Herrera, the guardian of Carter's property.

[5] OCGA § 31-12-7 was formerly codified as GCA § 88-1201.1, which was passed in 1972.

specific diagnoses; initiating and continuing therapy; and assessing the program.

OCGA § 31-12-7 (a) requires the DHR to set up an infant screening program for sickle cell disorders.

> In coordination and association with the system established by the department for the screening, retrieval, and diagnosis of certain metabolic and genetic disorders pursuant to Code Section 31-12-6, the [DHR] . . . shall adopt and promulgate appropriate rules and regulations governing tests for sickle cell anemia, sickle cell trait, and other metabolic and genetic disorders . . . so that *as nearly as possible* all newborn infants who are susceptible or likely to have sickle cell anemia, sickle cell trait, or other metabolic and genetic disorders shall receive a test for sickle cell anemia, sickle cell trait, or other metabolic and genetic disorders or all of such conditions as soon after birth as successful testing and treatment therefor may be initiated.[6]

The notification component of this statute, which forms the basis of Troutman's lawsuit, provides as follows:

> If any such child is found to have sickle cell anemia or sickle cell trait, it shall be the duty of the examining physician *or* the [DHR] to inform the parents of such child that the child is so afflicted and, if such child has sickle cell anemia or sickle cell trait, that counseling regarding the nature of the disease, its effects, and its treatment is available without cost from the department and the county board of health or county department of health.[7]

Carter's test result was positive for sickle cell disease, but she and her mother were discharged from the Hospital before the result became available. The Foundation made multiple attempts to contact Troutman concerning the test result, but could not reach her because the contact information on the form it had been given, entitled the "Georgia Department of Human Resources Exam for Abnormal Hemoglobins, Neonatal," was incorrect. Troutman was unaware that the Foundation was trying to contact her and apparently was not otherwise informed that Carter had the disease. Unfortunately, on

---

[6] (Emphasis supplied.)

[7] (Emphasis supplied.) OCGA § 31-12-7 (b).

March 14, 2003, Carter suffered a debilitating stroke, which is a known complication of untreated sickle cell anemia.

On September 28, 2004, Carter, through her mother, sued the DHR; Drs. Hammad and Patonay, one of whom allegedly examined Carter at her birth and ordered the sickle cell test; the Foundation; and MCG. Troutman asserted claims of negligence and negligence per se, alleging that the defendants breached their duty to inform her of the positive sickle cell test result and that, had she known of the test result, she could have obtained treatment for Carter and prevented her stroke. Subsequently, Ann J. Herrera, the guardian of Carter's property, was substituted as Plaintiff.

The DHR moved to dismiss for lack of subject matter jurisdiction on the ground of sovereign immunity. Patonay moved for summary judgment on the grounds that Plaintiff failed to file an expert affidavit as required by OCGA § 9-11-9.1 and that the claims were barred by the statute of limitation and statute of repose applicable to medical malpractice actions.[8] Hammad and his medical practice, Hammad, Platner, and Charles-May, M.D., P.C., moved for summary judgment on those same grounds and the ground that legal reporting requirements, codified at OCGA § 31-12-7, do not impose strict liability on a health care provider. MCG moved to dismiss the complaint for failure to file an expert affidavit as required by OCGA § 9-11-9.1. Plaintiff moved for partial summary judgment against the DHR, asserting that it is liable under OCGA § 31-12-7 for negligence per se. The Foundation moved for summary judgment on the basis that it owed no statutory or contractual duty to Carter.

The trial court ruled that no private right of action exists for violation of OCGA § 31-12-7 (b) and that any cause of action based on the statute failed as a matter of law. The court expressly declined to determine whether the DHR had waived its sovereign immunity. Regarding the physician defendants, the trial court ruled that the failure to communicate a positive sickle cell test result is a separate cognizable medical malpractice claim that could have been filed, if it had not been time barred by the statute of limitation set forth in OCGA § 9-3-73. As a result, the court granted the defendants' motions to dismiss and motions for summary judgment, denied Plaintiff's motion for partial summary judgment, and granted summary judgment, sua sponte, to the Foundation. Plaintiff appeals, arguing that the trial court erred in three ways: (1) by concluding that no

---

[8] Personal injury actions must be brought within two years after the right of action accrues, OCGA § 9-3-33, and, for minors, the statutory limitation period is tolled until the minor reaches the age of majority, OCGA § 9-3-90 (a). However, in medical malpractice actions, minors are subject to a two-year statute of limitation in addition to a five-year statute of repose, OCGA § 9-3-73 (b), (c) (2).

private right of action exists for a violation of OCGA § 31-12-7, (2) by failing to enter partial summary judgment against the DHR on the issue of negligence per se, and (3) by concluding that the claims against the physicians sound in medical malpractice rather than negligence.

## FACTS RELEVANT TO ALL CLAIMS

On appeal from the grant or denial of a motion for summary judgment, this Court reviews the record de novo, construing the evidence and the inferences drawn from it most strongly in favor of the nonmoving party.[9] "When a question of law is at issue, as here, we owe no deference to the trial court's ruling and apply the 'plain legal error' standard of review."[10] We cannot resolve the facts, however.[11]

In this case, the record shows that Troutman was living at Bedford Pines Apartments with her two older children when Carter was born. Troutman deposed that she moved in with her mother when Carter was a few months old. Troutman then moved to a different apartment complex for a few months, then back to her mother's house, then, finally, into her own home. It is undisputed that the Foundation sent letters to Troutman on March 18, 1991, and March 6, 1992, indicating that her baby had been tested for sickle cell trait and that it was "extremely important" that Troutman know the results. The letters were sent to her last known address as it appeared on lab forms from the hospital. None of those records reflects her apartment number at Bedford Pines, although the number does appear on her hospital admission form. Jacquelyn George, who has been a counselor at the Foundation since 1978, testified that in addition to writing the letters, she tried to contact Troutman by telephone. Troutman's number was disconnected, so George called Hammad's office. Hammad was listed on the DHR abnormal hemoglobin form as the physician to whom abnormal results should be reported, although Patonay was listed as Carter's attending physician on the admission form. Troutman did not fill out the DHR form, although she was familiar with such forms through her work as a phlebotomist, and did not meet the pediatrician in the hospital who was assigned to attend Carter. Hammad testified that Patonay, who was employed by his professional corporation at the time Carter was born, was the pediatrician on call who examined Carter in the hospital and ordered the sickle cell test. Troutman only knew that

---

[9] *Harrison v. Daly*, 268 Ga. App. 280, 281 (601 SE2d 771) (2004); *Desai v. Silver Dollar City*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997).

[10] (Citation omitted.) *Suarez v. Halbert*, 246 Ga. App. 822, 824 (1) (543 SE2d 733) (2000).

[11] *Fletcher v. Amax, Inc.*, 160 Ga. App. 692, 695 (288 SE2d 49) (1981).

Carter had been examined by someone from Hammad's practice, and only went to Hammad once after the baby was born. Troutman changed pediatricians to Cuba when the baby was five weeks old, but returned to Hammad when Cuba went out of town for a period of time when Carter was five or six years old. Cuba was Carter's pediatrician when she had a stroke.

When George called Hammad's office to locate Carter, an employee reported that Carter had never been seen in the office and that her file had been turned over to a collection agent. George testified that the first time she was given an apartment number for Carter was on March 19, 2003, shortly after Carter's stroke, when she spoke with Cuba, Carter's pediatrician. Cuba informed her that Troutman was told, when Carter was born, that the child had sickle cell trait. Troutman testified that she knew that she herself had sickle cell trait since she became pregnant with her eldest child and had learned that her father, Carter's grandfather, carried the trait as well. Troutman, who became a phlebotomist after Carter was born, further testified that she knew that if the father carried the trait, the risk of the child developing the disease increased. However, she testified that, prior to Carter's stroke, she never questioned whether any of her children may have had sickle trait or sickle trait anemia and did not inquire whether the fathers of any of her three children carried the trait. Troutman has had no contact with Carter's father since Carter was an infant.

Troutman testified that Carter became ill in 2001. She had been vomiting and Troutman took her to Cuba. The child passed out in the elevator on the way to Cuba's office; the whites of her eyes had become yellow, and she was disoriented. Carter's condition improved for a time, but eight months later, in March 2002, she became ill again — vomiting, coughing, eating poorly — and Troutman returned with her to Cuba, who ordered a complete blood count. Troutman took Carter's blood sample herself, to keep costs down, received a copy of the results, and faxed them to Cuba's office because there were abnormalities.[12] In October 2002, Cuba referred Carter to a gastroenterologist, Dr. Finch. Troutman gave Finch a family medical history, disclosing her sickle cell trait and that of her father. Finch ordered blood work for Carter for a series of tests, but Troutman failed to bring Carter back to obtain the tests. Carter was evaluated for bedwetting at Georgia Urology in November 2002, but Troutman denied that the practice scheduled Carter for a follow-up. Carter had a stroke on March 14, 2003. Troutman learned after the stroke that Carter had sickle cell anemia.

---

[12] The results are not in the record.

## STRICT LIABILITY: ALL DEFENDANTS

1. Plaintiff essentially argues that, because Troutman received no notice that Carter had tested positive for sickle cell anemia, as required by OCGA § 31-12-7 (b), the DHR should be held strictly liable for the consequences. Plaintiff reads the statute too narrowly. The statutory scheme does not evince an intent to impose strict liability for violating the notice requirement. "The cardinal rule in construing a legislative act is to ascertain the legislative intent and purpose in enacting the law, and then to give it that construction which will effectuate the legislative intent and purpose."[13] In so doing,

> [a] statute must be construed in relation to other statutes of which it is a part, and all statutes relating to the same subject-matter, briefly called statutes 'in pari materia,' are construed together, and harmonized wherever possible, so as to ascertain the legislative intendment and give effect thereto.[14]

Therefore, we examine both statutes comprising the GNSP, OCGA §§ 31-12-6 and 31-12-7, to determine the legislative intent.

OCGA § 31-12-6 explains that the GNSP should have five components: "screening newborns for the disorders; retrieving potentially affected screenees back into the health care system; accomplishing specific diagnoses; initiating and continuing therapy; and assessing the program." Next, OCGA § 31-12-7 instructs that, in coordination with the system developed by the DHR "for the screening, retrieval, and diagnosis of certain metabolic and genetic disorders," the DHR shall also

> adopt and promulgate appropriate rules and regulations governing tests for sickle cell anemia, sickle cell trait, and other metabolic and genetic disorders ... so that *as nearly as possible* all newborn infants who are susceptible or likely to have sickle cell anemia, sickle cell trait, or other metabolic and genetic disorders shall receive a test.

---

[13] (Citation and punctuation omitted.) *Carringer v. Rodgers*, 276 Ga. 359, 363 (578 SE2d 841) (2003).

[14] (Citation and punctuation omitted.) *City of Buchanan v. Pope*, 222 Ga. App. 716, 717 (1) (476 SE2d 53) (1996). See also *Dept. of Community Health v. Gwinnett Hosp. System*, 262 Ga. App. 879, 886 (1) (586 SE2d 762) (2003) ("[s]tatutes must be construed . . . to square with common sense and sound reasoning") (citation and punctuation omitted).

Subsection (b) then states that it shall be the duty of either the examining physician or the DHR to inform the parents that the child is so afflicted. The remainder of the Code section requires that counseling be given to the parents, if they so request it.

We apply the "basic rule of construction that a statute . . . should be construed to make all its parts harmonize and to give a sensible and intelligent effect to each part, as it is not presumed that the legislature intended that any part would be without meaning."[15] Bearing this in mind, we conclude that the legislature intended that, just as one goal of the GNSP is to test all susceptible newborns "as nearly as possible," so too the goal of the notice provision is to communicate actual notice to each and every parent of an afflicted child. But the evidence in this case shows that 100 percent compliance is not feasible; nor do we believe the legislature intended to impose strict liability whenever a parent does not receive notice. Especially with regard to the DHR, such a holding would contravene the rule that "[a] substantial compliance with any statutory requirement, especially on the part of public officers, shall be deemed and held sufficient."[16] Accordingly, the defendants cannot be held strictly liable, and the trial court correctly denied Plaintiff's motion for partial summary judgment against the DHR.

## THE DHR: SOVEREIGN IMMUNITY

2. Furthermore, the negligence claim against the DHR, brought under the Georgia Tort Claims Act ("GTCA"), OCGA § 50-21-20 et seq., is barred by sovereign immunity. Sovereign immunity insulates the state and its departments and agencies from liability except to the extent that the legislature enacts a specific waiver.[17] The party seeking to benefit from a waiver of sovereign immunity has the burden to establish waiver, and any suit brought to which an exception applies is subject to dismissal pursuant to OCGA § 9-11-12 (b) (1) for lack of subject matter jurisdiction.[18] Although a trial court's factual findings are sustained if supported by any evidence,[19] the trial

---

[15] (Citation and punctuation omitted.) *Gilbert v. Richardson*, 264 Ga. 744, 747-748 (3) (452 SE2d 476) (1994).

[16] OCGA § 1-3-1 (c). See, e.g., *City of College Park v. Atlantic Southeastern Airlines*, 194 Ga. App. 637, 639 (391 SE2d 460) (1990); *Hart v. Columbus*, 125 Ga. App. 625, 631 (2) (188 SE2d 422) (1972).

[17] Ga. Const. 1983, Art. I, Sec. II, Par. IX (e).

[18] *Murray v. Ga. Dept. of Transp.*, 284 Ga. App. 263, 265 (2) (644 SE2d 290) (2007).

[19] Id.

court in this case declined to decide the issue. Thus, we review the matter de novo.[20]

OCGA § 50-21-23 waives the state's sovereign immunity as to torts by state employees, but only to the extent and in the manner provided in the GTCA. In the case at bar, Plaintiff does not name any state employee who committed any tort. Rather, Plaintiff asserts that OCGA § 31-12-7 (b) creates a nondelegable duty upon the DHR to inform parents of afflicted children of positive sickle cell test results. We disagree. Pursuant to OCGA § 31-2-1,

> [t]he [DHR] is created and established to safeguard and promote the health of the people of this state and is empowered to employ all legal means appropriate to that end. Illustrating, without limiting, the foregoing grant of authority, the [DHR] is empowered to: . . . (10) Contract and execute releases for assistance in the performance of its functions and the exercise of its powers and to supply services which are within its purview to perform.

In addition, OCGA § 31-3-5 places the responsibility for compliance with the DHR's rules and regulations that have local application with the local county health department.[21] Finally, OCGA § 31-12-7 (b) provides that the duty to notify rests with either the DHR or the attending physician, not both. In keeping with the statute, the DHR's current regulation states as follows:

> In the event of an abnormal or unsatisfactory test result . . . the approved screening laboratory doing the testing shall notify within twenty-four (24) hours after the testing is complete the appropriate follow-up contractor, who will contact the attending physician. If the follow-up contractor is unable to reach the attending physician, it will then contact the parents or legal guardians. If the parents or legal guardians cannot be reached or are non-responsive, the follow-up contractor will contact the local health department for assistance.[22]

---

[20] See *Dept. of Human Resources v. Johnson*, 264 Ga. App. 730, 731 (592 SE2d 124) (2003), aff'd, *Johnson v. Ga. Dept. of Human Resources*, 278 Ga. 714 (606 SE2d 270) (2004).

[21] OCGA § 31-3-5 (a) states that "each county board of health shall have and discharge, within its jurisdiction, . . . the following functions: . . . (3) To secure compliance with the rules and regulations of the [DHR] that have local application."

[22] Ga. Comp. R. & Regs. r. 290-5-24-.02 (6). The regulation in effect when Carter was born is not in the record.

The process in effect when Carter was born was explained by Mary Ann Henson, who has overseen the GNSP since 1986 and is also the sole full-time employee assigned to the Program. Henson deposed that in 1991, if a child was tested for sickle cell, the specimens would be sent to one of three regional laboratories (Macon, Waycross or Albany). The lab would test the specimen and report the results to the submitting hospital, the physician whose name was on the abnormal hemoglobins reporting form,[23] and the county health department. If the result was positive, a report would be sent to MCG in addition to those three entities. In 1990, the DHR had contracted with MCG for the latter to "[n]otify primary physicians and appropriate health care agencies when infants are found to have a clinically significant hemoglobinopathy." Henson testified that MCG's "first responsibility was to find that baby and get another specimen and confirm whether or not it actually was sickle cell anemia." If the family resided in the metropolitan Atlanta area, then defined as Fulton, DeKalb, Cobb, and Gwinnett counties, MCG would also send the results to the Foundation, which would attempt to contact the family.[24] The test results were not sent to the DHR, although the lab would submit a list of the number of babies tested and the results for each type of test. As Henson explained, the success of the GNSP depends on finding the baby. If the physician listed on the form does not see the child and has no information on his or her whereabouts, then the hospital of birth is called to see if it can provide additional information; and finally, the county health department is asked to help locate the child. Henson testified approximately 150 infants are diagnosed with sickle cell disease annually, and of that number only one percent is lost to follow-up.

Henson's testimony establishes that, in accordance with the power vested in the DHR by OCGA §§ 31-2-1 and 31-3-5, the duty to notify parents of infants who tested positive for sickle cell disease was delegated by contract to MCG. The DHR cannot be held liable for the negligence of any independent contractor. "The Georgia General Assembly has spoken by removing from the pool of State employees covered by the Georgia Tort Claims Act independent contractors and corporations, and by failing to include in OCGA § 51-2-5 a waiver of sovereign immunity."[25] Plaintiff's negligence claim against the DHR is barred by sovereign immunity.

---

[23] Dr. Hammad is listed on this form.

[24] The Foundation provides counseling services to families of children with sickle cell disease, and the DHR audits those services.

[25] *Johnson v. Ga. Dept. of Human Resources*, supra at 716-717 (2) (DHR and DJJ have "meaningful statutory responsibilities for children placed in their custody, and they satisfy

## THE FOUNDATION

3. In her notice of appeal, Plaintiff states that she appeals from the order granting summary judgment, sua sponte, to the Foundation. But Plaintiff does not raise this issue within her enumerations of error or argument. She merely recounts the Foundation's argument within her statement of facts. Pretermitting whether Plaintiff waived her right to assert the grant of summary judgment to this defendant as error on appeal by failing to enumerate error thereon, we find no error in the trial court's ruling.

Procedurally, the record shows that the case was transferred from Fulton County State Court to DeKalb County State Court on March 23, 2006. The Foundation's motion for summary judgment had been filed in Fulton County on March 15 but was not transferred with the rest of the case file to DeKalb County State Court and was not filed in that court until after the trial court's order was entered. Thus, the trial court did not have the motion for summary judgment prior to granting it. Nevertheless, a trial court may grant summary judgment sua sponte, so long as "the record supports such a judgment, [and] . . . the party against whom summary judgment is rendered is given full and fair notice and opportunity to respond prior to entry of summary judgment."[26]

In the case at bar, Plaintiff was given a full and final opportunity to challenge the contentions made in the Foundation's motion for summary judgment. On July 7, 2006, Plaintiff responded to the Foundation's motion, arguing that it had an affirmative statutory and contractual duty to notify — not attempt to notify — Troutman of her child's affliction.

On the merits, the Foundation is entitled to summary judgment. As we held in Division 1, it cannot be held strictly liable for failing to reach Troutman. In a footnote in her appellate brief, Plaintiff contends that even if the Foundation had no duty to notify Carter's mother that the child had sickle cell anemia, once it undertook the obligation to contact her, it was required to do so in a nonnegligent manner. Plaintiff relies upon the principle that

one who undertakes to do an act or perform a service for another has the duty to exercise care, and is liable for injury

---

those responsibilities by exercising reasonable care in the selection and supervision of their independent contractors") (citations omitted).

[26] (Footnote omitted.) *Fraker v. C. W. Matthews Contracting Co.*, 272 Ga. App. 807, 816 (4) (614 SE2d 94) (2005). Accord *Boyd v. Calvary Portfolio Svcs.*, 285 Ga. App. 390, 392 (2) (646 SE2d 496) (2007).

resulting from his failure to do so, even though his under-taking is purely voluntary or even though it was completely gratuitous, and he was not under any obligation to do such act or perform such service.[27]

Assuming that this principle applies to the Foundation, Plaintiff still cannot survive summary judgment. In order to sustain a cause of action for negligence, a plaintiff must prove: (1) the existence of a legal duty; (2) a breach of this duty; (3) an injury; and (4) a causal relationship between the breach and the injury.[28] To prevail at summary judgment, a defendant, who will not bear the burden at trial, may point out that there is an absence of evidence to support an element of the plaintiff's case.[29] Once the defendant has done so, the plaintiff cannot rest upon her pleadings and has a duty to come forward with specific evidence demonstrating a question of fact.[30] In this case, the Foundation demonstrated that it exercised reasonable care in attempting to notify Troutman, by sending letters, trying to telephone her, and trying to learn her contact information from Hammad's office. In response, Plaintiff has pointed to no specific evidence demonstrating a question of fact. The trial court did not err in granting summary judgment to the Foundation sua sponte.

## THE MEDICAL DEFENDANTS: HAMMAD, PATONAY, AND MCG

4. (a) The Physicians: Dr. Patonay, Dr. Hammad, and Hammad, Platner, and Charles-May, M.D., P.C. Although the physicians cannot be held strictly liable under OCGA § 31-12-7 (b) for failing to inform Troutman of Carter's positive sickle cell results,[31] the trial court correctly noted that physicians have a common law duty to inform patients of their diagnoses. "The confidential relationship between doctor and patient creates a duty to inform the patient of his or her condition."[32] But a lawsuit premised upon a breach of this duty is a classic medical malpractice action.

---

[27] (Citation omitted.) *Osowski v. Smith*, 262 Ga. App. 538, 540 (1) (586 SE2d 71) (2003).

[28] *McKissick v. Giroux*, 272 Ga. App. 499, 500 (612 SE2d 827) (2005).

[29] Id., citing *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

[30] *Lau's Corp.*, supra.

[31] See Division 1.

[32] (Citation and punctuation omitted.) *Oliver v. Sutton*, 246 Ga. App. 436, 438 (540 SE2d 645) (2000). Compare *Peace v. Weisman*, 186 Ga. App. 697, 699 (2) (368 SE2d 319) (1988) (absent a physician-patient relationship, the doctor's only duty to a person examined is "to conduct the examination in such a manner as not to injure him") (citations omitted).

It is a well-settled principle of Georgia law that there can be no liability for malpractice in the absence of a physician-patient relationship. In such cases, called classic medical malpractice actions, doctor-patient privity is essential because it is this relation which is a result of a consensual transaction that establishes the legal duty to conform to a standard of conduct.[33]

Any duty that might have arisen outside of OCGA § 31-12-7 thus arose in the context of a medical malpractice claim.[34] The claims against the physicians are thus barred by Plaintiff's failure to file an expert affidavit pursuant to OCGA § 9-11-9.1.[35]

(b) MCG moved to dismiss the complaint for failure to file an expert affidavit as required by OCGA § 9-11-9.1. As we held in Division 1, MCG cannot be held strictly liable for any violation of OCGA § 31-12-7. Further, any claims against MCG are otherwise barred for the same reasons stated in Division 4 (a). Thus, dismissal of MCG was likewise proper.

*Judgment affirmed. Johnson, P. J., and Ruffin, J., concur.*

DECIDED NOVEMBER 7, 2007.

*Bird & Mabrey, William Q. Bird, Prescott L. Nottingham*, for appellant.

*Thurbert E. Baker, Attorney General, Claude M. Sitton, Assistant Attorney General, Huff, Powell & Bailey, Michael S. Bailey, Camille N. Jarman, Carlock, Copeland, Semler & Stair, Wade K. Copeland, Matthew D. Liebenhaut, Taylor, Busch, Slipakoff & Duma, Willie C. Adams, Brian D. Poe*, for appellee.

---

[33] (Punctuation omitted.) *Crisp Regional Hosp. v. Oliver*, 275 Ga. App. 578, 584-585 (5) (621 SE2d 554) (2005), citing *Peace, supra* at 698; *Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 201 (296 SE2d 693) (1982).

[34] Were we to accept Plaintiff's argument that the action sounds in simple negligence only, then the physician's common law duty that arises only in malpractice cases does not apply. See *Rowell v. McCue*, 188 Ga. App. 528, 530 (373 SE2d 243) (1988).

[35] OCGA § 9-3-73 (b), (c) (2).